IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DANAHER CORPORATION,

                                    Plaintiff,                    OPINION AND ORDER

        v.                                                        19-cv-750-wmc

LEAN FOCUS, LLC, and DAMON
BAKER,

                                    Defendants.

        In this civil action, plaintiff Danaher Corporation asserts claims against its former

employee Damon Baker and Baker's new company, Lean Focus, LLC, centered around

their alleged use of plaintiff's trade secrets in violation of federal and state law and

provisions of Baker's employment contracts with Danaher.  Before the court are the parties'

cross motions for summary judgment.  (Dkt. ##174, 184.)  For the reasons that follow,

the court will grant:   (1) plaintiff's motion for summary judgment in part as to its

Wisconsin Computer Crimes Act Claim as to certain documents; (2) defendants' motion

for summary as to plaintiff's breach of contract claim as to the assignment of developments

provision; and (3) defendants' motion for summary judgment as to plaintiff's conversion

claim.  In all other respects, however, the parties' motions will be denied.


UNDISPUTED FACTS[1]

**A.  The Parties**

        Plaintiff Danaher is a Delaware corporation with its principal place of business in

_____

[1] Unless otherwise noted, the court finds the following facts undisputed and material.

Washington, D.C.  Defendant Lean Focus is an Illinois limited liability company, with its principal place of business in Waunakee, Wisconsin.  Lean Focus has two members: defendant Damon Baker and April Lee.  Both Baker and Lee are Wisconsin citizens.  Baker is also the founder and CEO of Lean Focus.  In addition to founding Lean Focus, Baker had worked for Danaher between 2007 and 2016.

Both Danaher and Lean Focus provide consulting services to clients on "lean" principals, which plaintiff's corporate representative and designated "Trade Secret Custodian" John Sekowski described as originating in the "Toyota Production System." Danaher acknowledges having developed its "initial lean manufacturing tools," referred to as the "Danaher Production System" in the mid-1980s, with the help of a consulting group out of Japan, Shingijutsu.  Accordingly, there is no dispute that lean business systems are "common" and do not constitute a trade secret.[2]

### B.  Danaher Business System

Instead, plaintiff maintains that while its "roots" may be in the Toyota Production System, the "Danaher Business System" ("DBS") is the trade secret claimed in this case based on some of the tools related to "growth" and "leadership" that emerged decades later and have evolved further since then.  (Pl.'s Resp. to Defs.' PFOFs (dkt. #244) ¶ 7.)  Among other things, the parties dispute the extent to which DBS is modeled after the Toyota Production System, Six Sigma, Lean Six Sigmna, or other so-called lean systems.

---

[2] Indeed, Toyota Motor Corporation, like many others who followed, have been quite open about the essential components of its system, including lean manufacturing steps and real-time supply chains.  *See* https://global.toyota/en/company/vision-and-philosophy/production-system/index.html (last visited July 28, 2021).

Sekowski testified that what distinguishes DBS from other lean business systems is that "DBS is the culture of Danaher," which "is the uniqueness." (Defs.' PFOFs (dkt. #186) ¶ 10.) However, Sekowski also testified that:

> DBS is basically the codified best practices on how we do just about everything within the business: How we come up with an idea, . . . how we trystorm[3] it, how we ensure that it works, how [we] refine it over time and how we take seemingly difficult concepts and turn them into something that's simple through how we teach, through our training material, through our support material, through things as simple as acronyms, pictures and others.

(Pl.'s Resp. to Defs.' PFOFs (dkt. #244) ¶ 10.) Finally, Sekowski also testified that one of the best definitions of DBS is "[c]ommon sense vigorously applied," although it is "the codified 30-plus year development of how we do what we do." (Defs.' PFOFs (dkt. #186) ¶ 11; Pl.'s Resp. to Defs.' PFOFs (dkt. #244) ¶ 11.)

In creating DBS tools, Danaher at times "will look to the outside for inspiration and help" in finding source materials, including using other companies' materials and hiring outside consultants. (Defs.' PFOFs (dkt. #186) ¶ 32.) However, plaintiff maintains that it has not used proprietary materials of third parties to create DBS tools, and it has hired consultants subject to nondisclosure agreements. One consultant Danaher hired to assist in improving Danaher's problem-solving process, David Meier, acknowledged that he relied on publicly available sources, including *The Toyota Way Fieldbook*, for which the consultant contributed a chapter. (Defs.' PFOFs (dkt. #186) ¶ 33 (citing Sekowski Dep. (dkt. #193)

---

[3] "Try storming is a combination of brainstorming melded with rapid prototyping to determine if ideas will work quickly or not." "Trystorming," Lean Six Sigma Definition, https://www.leansixsigmadefinition.com/glossary/trystorming/.

113-14).)  Sekowski testified at his deposition that Danaher only "sometimes" maintains the source materials used to create a particular DBS tool.  In particular, Sekowski testified that he could not "remember exactly" what source material was used to create the "Problem Solving Process" tool, but that he believed the material was "of Danaher origin."  (Sekowski Dep. (dkt. #119) 117.)  Sekowski further acknowledged that defendant Baker was the "main person that [he] assigned to" develop this tool and put "in charge" of this project, and Baker, along with a number of other people on the team, would have information about the source material.  (*Id.* at 118-19.)

Baker also recalled that DBS tools were often developed by groups of Danaher associates who were instructed by Sekowski to bring in relevant training materials, tools and templates from current and past work experience.[4]  Specifically, Baker cites examples in his initial expert report of other companies' materials being used in the development of DBS tools, and specifically in the development of the Problem Solving Process Tool for which he was principally responsible.  (Baker 5/4/21 Decl. (dkt. #190) ¶ 6-7 (citing Baker Expert Rept. (dkt. #190-1) 32-33, 36).)  Plaintiff also would dispute that Sekowski instructed employees to use without authorization materials from prior employers, but

---

[4] Plaintiff contends that Baker lacks personal knowledge for this and other assertions in his declaration.  To the extent that plaintiff is seeking to strike portions of Baker's declaration under the sham declaration doctrine, however, plaintiff does not direct the court to actual conflicts. Instead, plaintiff simply points to deposition testimony where Baker failed to provide the level of detail that he now provides in his declaration.  This may form a basis for impeachment, but it does not serve as a basis to disregard the assertions in his declaration wholesale, especially when plaintiff merely objects, asserting generally that Baker lacks "personal knowledge," but neither explains *why* Baker would lack the necessary personal knowledge to challenge its averments, many of which concern his knowledge and activities, nor why he lacks personal knowledge with regard to matters in which he was plainly involved.  To the contrary, Baker lists "third-party sources that I know of that were used in the development of DBS tools."  (Baker Expert Rept. (dkt. #190-1) 32.)

Baker represents that Sekowski *instructed* DBS Office employees to upload relevant materials from within or outside Danaher to a document sharing repository for use in creating and revising DBS materials.  (Defs.' PFOFs (dkt. #186) ¶ 46 (citing Baker Decl. (dkt. #128) ¶ 3.)  Two other, former Danaher employees provide a similar account.  (*Id.* (citing declarations (dkt. ##129, 130).)    While plaintiff disputes all of these representations, directing the court to Sekowski's own declaration and deposition testimony in which he averred that he would *not* have instructed Danaher employees to upload materials from their former employers because this "would be against our guidelines and code of conduct," (Sekowski Dep. (dkt. #193) 154; Sekowski 3/2/21 Decl. (dkt. #139) ¶ 5), this merely demonstrates disputes of fact, which require a trial.

Even if this were insufficient, defendants point to conflicting statements *from Danaher's officers* about DBS as well.  In October 2018, then President Tom Joyce said in a speech at the University of Richmond that the "Danaher Production System is the same thing as lean manufacturing tools of the Toyota Production System."  (Defs.' PFOFs (dkt. #186) ¶ 55.)  Alice White, the former Vice President of Talent Acquisition at Danaher, said in a 2016 presentation at the Destination Talent Conference that DBS is

> nothing we created.  Most of Danaher Business System is a combination of really good best practices that were developed elsewhere.  So the Toyota manufacturing system, lean, you know, the approach to kaizen which is continuous improvement, none of the stuff . . . that we have created.

(*Id.* ¶ 56.)  Plaintiff rightly points out that White immediately followed the cited statement

by described DBS as "novel."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #244) ¶ 56.)[5]  However, former Danaher employee Guy Schiller testified at his deposition that creation of materials similar to DBS templates could be done with "effort and available information."  (Defs.' PFOFs (dkt. #186) ¶ 57.)   Plaintiff disputes this pointing to the testimony of another former Danaher employee Rene Frauenknecht.  However, Frauenknecht, testified that the amount of time to recreate a DBS tool or template based on publicly available materials would depend on the "complexity of that tool or template," and that for something "fairly straightforward," he could recreate it in "probably 15 to 30 minutes," while a more "complicated tool" would "take a lot longer and it's going to require a lot more investment in time and effort."  (Defs.' Reply in Support of Defs.' PFOFs (dkt. #271) ¶ 57 (citing Frauenknecht Dep. (dkt. #218) 196-97).)

## C. Treatment of DBS within Danaher

Within Danaher, DBS is "embraced by . . . virtually every associate" and "many aspects of DBS" are available to all Danaher associates who "have a [user]name at Danaher or at the operating company with a password" to access Danaher's intranet site, Danaher Connect.  (Defs.' PFOFs (dkt. #186) ¶ 12.)  Plaintiff does not dispute this, but points out that Danaher Connect's "Terms of Use" impose certain confidentiality obligations on users accessing material on Danaher Connect and that Danaher Connect requires two-factor authentication for access.  Furthermore, Danaher points out that its Code of Conduct and

---

[5] Plaintiff also objects to the treatment of White's statement as a statement of a party-opponent, but given her position as a Vice President, the court is inclined to view her as an agent of Danaher, capable of speaking for it, particularly at summary judgment.

Standard Terms and Conditions of Employees restrict Danaher associations from using DBS materials outside of Danaher without proper authorization, restrict use for a non-Danaher business purpose and restrict disclosing information about DBS.

There is also no dispute that most of Danaher's more than 60,000 employees, including administrative personnel such as executive assistants and mail clerks, have access to Danaher Connect.  Sekowski explains that "DBS is the root of our success.  If we kept it hidden within Danaher, how can the associates understand it?"  (Defs.' PFOFs  (dkt. #186) ¶ 16.)  Danaher Connect does not track employees' access to and use of DBS materials or prevent employees from downloading, emailing or printing them.  While certain DBS tools are available only to senior leaders, each of the DBS tools that Danaher identified in Sekowski's expert reports as having been copied by defendants are generally accessible in Danaher Connect.  Defendants further set out the public availability of various DBS materials in their proposed findings.  (Defs.' PFOFs (dkt. #186) ¶¶ 97-99, 101-102.)

At least since June 2019, Danaher has maintained a policy[6] that "assigns an IP sensitivity level to every item in the DBS inventory."  (Defs.' PFOFs (dkt. #186) ¶ 17.)  Specifically, Danaher categorizes DBS materials into one of four IP sensitivity levels, with Level 1 described as "Trade Secrets."  (*Id.* ¶ 18.)  The phrase "trade secrets" is not included in the description of the materials that fall within the other three categories, although plaintiff maintains that "DBS materials assigned to any of the four IP sensitivity levels are

---

[6] Plaintiff makes much of the fact that the cited document is a "training presentation," rather than a policy itself, but there appears to be no credible dispute that the presentation describes a policy.

treated as trade secrets."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #244) ¶ 19 (citing Sekowski Dep. (dkt. #193) 195 ("All DBS is trade secrets.").)  Of the ten tools that Sekowski identified in his expert reports as tools defendants copied, the policy places five of those tools -- DBS Fundaments (Problem Solving Process, Transactional Process Improvement and Visual & Daily Management), Funnel Management, and Policy Deployment -- outside of the Level 1 "Trade Secrets" category.  Moreover, in the presentation describing the policy, Sekowski also testified that the remaining five tools were not expressly identified as falling within the Level 1 category.  (Defs.' PFOFs (dkt. #186) ¶ 21 (citing Sekowski Dep. (dkt. #193) 202).)

Danaher also provides employees with a Code of Conduct, Standards of Conduct and online training on the protection of confidential information and trade secrets. Defendants points out that these documents do not expressly reference DBS when discussing the protection of proprietary information.  Moreover, online training modules about trade secret protection, and specifically defining trade secrets and identifying examples for Danaher employees, similarly do not mention DBS, although plaintiff contends that the training and admonitions in the presentations apply to DBS materials. Moreover, Danaher alumni confirmed that Danaher instructs Danaher associates to keep DBS and its tools confidential.

DBS also has a practice of affixing a "trade secret" label on certain materials.  In response to the court's February 26, 2021, order, however, Danaher has not affixed this label to any of the documents identified as materials defendants misappropriated.  Plaintiff does not dispute this, but points out that Danaher marks its DBS tool presentations as

"confidential and proprietary" and treats them as trade secrets. Defendants maintain that plaintiff limits its use of the "trade secret" label to those materials identified as Level 1 Trade Secrets, offering the "LEAN Playbook" as an example.

While Danaher does require some employees to sign nondisclosure agreements, it has not required that every employee with access to DBS sign one.[7] Instead, Danaher has identified two categories of employees that are required to sign a nondisclosure agreement: employees within the DBS Office, who are "typically" required to sign, and DBS Leaders, who are subject to nondisclosure agreements "as a matter of practice." (Defs.' PFOFs (dkt. #186) ¶ 29 (quoting Ex. 150 (dkt. #188-50).) Still, plaintiff points out that all employees must sign a certification requiring them to abide by Danaher's Code of Conduct, and they are required to assent to Danaher's Standard Terms and Conditions of Employment, which contains a nondisclosure provision that expressly mentions DBS. Furthermore, Danaher associates agree to abide by Danaher Connect's Terms of Use, which also imposes the confidentiality obligations described above.

Sekowski avers that if a Danaher associate or former associate violates these conditions and shares DBS information outside of Danaher, Danaher sends the individual and/or publisher a cease-and-desist letter demanding removal of the DBS information.

---

[7] Defendants point out that this court previously determined at the pleadings stage that defendant Baker's 2014 nondisclosure agreement was unenforceable under Wisconsin law, thus calling into question the validity of the same agreement as to other Danaher employees. (7/24/20 Op. & Order (dkt. #65) 16.) Defendants also point out that the Eastern District determined that another nondisclosure agreement was unenforceable. *See Danaher Corp. v. Gardner Denver, Inc.*, No, 2:19-cv-01794-JPS (E.D. Wis. May 20, 2020) (dkt. #50).

**D. Sharing of DBS Materials Outside of Danaher**

Notwithstanding purported efforts to keep the essentials of DBS within the company, Danaher also acknowledges sharing DBS materials with independent strategic partners and nonprofits, and only sometimes subject to nondisclosure agreements. For example, Sekowski gave a presentation at the North American Manufacturing Excellence Summit, an event where attendees did not sign nondisclosure agreements, and even employees of Danaher competitors could have been in attendance. That presentation contained slides showing: the entire DBS toolbox structure, including aspects of the structure that Sekowski opines in his expert report defendants copied; material within the DBS tool known as "Kaizen Event Basics"; material within Danaher's "Visual and Daily Management" tool that he described as "trade secrets" and which he opines in his expert report defendants copied; and an image of a DBS tool called CDT&R, which Sekowski also opines defendants copied. (Defs.' PFOFs (dkt. #186) ¶ 41.) Plaintiff does not dispute any of the public disclosures, but instead argues that the images were "displayed briefly and not provided in hard or electronic copy to the audience." (Pl.'s Resp. to Defs.' PFOFs (dkt. #244) ¶ 41.) Danaher employees have also given presentations about DBS tools to investors.[8]

Likewise, Danaher shared DBS tools and materials with nonprofits, including the Northern Illinois Food Bank and Success Academy Charter Schools. At least with respect to the food bank, it does not appear that Danaher required it to sign a nondisclosure

---

[8] The parties further dispute whether other, former Danaher employees have disclosed DBS material in later employment.

agreement, although as Danaher points out the food bank was not a Danaher competitor. Danaher's operating company, Beckman Coulter, has similarly shared DBS materials with its customers and others, although plaintiff again asserts that the materials were shared with its "partners" subject to nondisclosure agreements.

Defendants next point to other DBS materials that are publicly available on the internet, although plaintiff characterizes some of these materials as "summary, generic information available online through infrequent investor presentations and mandatory regulatory filings," while others were "posted by former Danaher employees without permission." (Pl.'s Resp. to Defs.' PFOFs (dkt. #244) ¶ 49.) Even so, at least in January 2020, the Danaher page of an online document storage website called "QuickBase" was accessible via Google search results without any login credentials or password. Plaintiff acknowledges this, but asserts this was "because of an inadvertent technical glitch that was promptly resolved and fixed after Danaher learned of it." (*Id.* ¶ 50.) Baker also testified that DBS materials he accessed through QuickBase "shouldn't have been accessible." (Pl.'s Add'l PFOFs (dkt. #186) ¶ 141 (quoting Baker Dep. (dkt. #217) 237-38).) However, Sekowski took no steps to identify the individuals who had accessed those materials in an effort to regain possession of any copies or restrict its circulation. In addition to QuickBase, DBS materials were available in an "Introduction to DBS" module on a Danaher-hosted website in January 2021. Again, plaintiff characterizes this as an "inadvertent technical glitch." (*Id.* ¶ 52.)

During his deposition, Sekowski also testified that he reminds DBS Office employees "to keep their eyes and ears open" to any potential trade secret disclosures and

report any to him, but he is unaware of Danaher "hiring any sort of vendors to monitor the Internet for the public disclosure of DBS tools." (*Id.* ¶ 53 (citing Sekowski Dep. (dkt. #193) 185-86).)

### E.  Damon Baker's Tenure at Danaher

Danaher hired Baker in July 2007 as the Global Director of the "Danaher Business System for Videojet Technologies," a Danaher operating company.  The job posting for the Global Director position stated that an applicant had to have a "master of a variety of DBS tools" and the "[a]bility to articulate the DBS philosophy." (Defs.' PFOFs (dkt. #186) ¶ 59.)  While Baker had no prior experience with Danaher -- and, thus, no experience with DBS -- he was offered the position, apparently because of his prior experience with lean and continuous improvement systems at other companies.  In July 2010, Baker next became a Corporate Director in Danaher's DBS Office, a department within Danaher that employs approximately 40 individuals to help "codify" and "disseminate" DBS principals.  (*Id.* ¶ 60.)  From there, Baker moved into a role at another Danaher operating company, "Orascoptic" in July 2012, before returning to the DBS Office in April 2014.  The parties agree that Danaher did not ask Baker to sign an employment agreement containing nondisclosure provisions until he moved to Orascoptic -- approximately five years after the commencement of his employment with Danaher -- although plaintiff points out that at the time of his initial employment, Baker reviewed and signed a commitment to comply with Danaher's Standards of Conduct, which included general nondisclosure obligations.

In contrast, the nondisclosure provision in the "Agreement Concerning Solicitation and Protection of Proprietary Interests" ("2012 Agreement") expressly states that Baker may not "utilize or disclose to anyone outside of [Danaher] any Confidential Information or any information received by [Danaher] in confidence from or about third parties, as long as such matter remain trade secrets and confidential" for "thirty-six (36) months after the termination of [his] employment or relationship with [Danaher]" and applies in "all countries in which [he] performed work for [Danaher] during the twenty-four (24) months preceding the termination of [his] employment or relationship with [Danaher]." (*Id.* ¶ 63 (quoting Ex. 164 (dkt. #189-14) 3).)   The 2012 Agreement also defines "Confidential Information" as

> the trade secrets and other confidential information of the Company which is not generally known to the public, and which (a) is generated or collected by or utilized in the operations of the Company and relates to the actual or anticipated business or research or development of the Company or the Company's actual or prospective vendors or customers; or (b) is suggested by or results from any task assigned to me by the Company or work performed by me for or on behalf of the Company or any customer of the Company. Confidential information shall not be considered generally known to the public if revealed improperly to the public by me or others without the Company's express written consent and/or in violation of an obligations of confidentiality to the Company.

(*Id.* ¶ 64 (quoting Ex. 164 (dkt. #189-14) 2-3).)  That definition then lists dozens of types of information that the provision encompasses.  The 2012 Agreement further contains a provision requiring Baker to return tangible materials to Danaher upon his departure. Finally, the agreement contained a provision assigning all of the employee's developments

to Danaher, as the court discusses below.  (Pl.'s Add'l PFOFs (dkt. #244) ¶ 108 (citing Ex. 164 (dkt. #189-14) ¶ 3).)

In 2014, at the time Baker rejoined its DBS Office, Danaher asked that Baker sign another agreement containing confidentiality provisions.  This Nondisclosure and Assignment Agreement ("2014 Agreement") prohibited Baker from using or disclosing Danaher's confidential information "during and after [his] employment" and also contained a "return of property" provision.  (*Id.* ¶¶ 67-68 (quoting Ex. 164 (dkt. #189-14) 1).)[9]  The 2014 Agreement also contains a provision assigning all developments of the employee to Danaher.  (Pl.'s Add'l PFOFs (dkt. #244) ¶ 107 (citing Ex. 164 (dkt. #189-14) ¶ 3).)  The 2014 Agreement contains the following merger clause:

> Except as set forth in the Danaher Corporation Standards of Conduct, with respect to the subject matters in this Agreement, this Agreement is my entire agreement with the Company, and its amends (to the extent enforceable) all previous oral or written understandings or Agreements made with the Company.

(*Id.* ¶ 69 (quoting Ex. 164 (dkt. #189-14) 1).)

## F.  Baker's Departure for Eaton Corporation

In August 2016, Baker advised Danaher personnel, including Sekowski, that he planned to accept a position at Eaton Corporation, indicating that his last day would be September 16, 2016.  On September 11, 2016, Baker changed his LinkedIn profile to

---

[9] The court previously determined that the nondisclosure provision in the Agreement was unenforceable.

14

reflect his new position at Eaton, and Danaher officially accepted Baker's resignation effective September 12, 2016.

Shortly thereafter, Eaton and Baker began to receive correspondence from Danaher expressing concerns that Baker was using and disclosing its confidential information and trade secrets, as well as failing to return USB devices and documents belonging to Danaher. Specifically, on September 13, 2016, Danaher sent a letter to Eaton and Baker explaining that it believed Baker would:  use and disclose Danaher's confidential information; breach his employment agreements; fail to return Danaher's property; solicit Danaher employees; and breach his duty of loyalty to Danaher.  The letter further stated, "Danaher will not hesitate to take all necessary legal actions to protect the confidentiality of trade secrets." (Pls.' PFOFs (dkt. #176) ¶ 11 (quoting Berg Decl., Ex. 6 (dkt. #179-8) 2).)

On September 23, Danaher sent another letter alleging that Baker:  would not certify return of Danaher's property; had publicly disclosed Danaher's confidential information; was not complying with his contractual obligations; and was disclosing and using Danaher's confidential information and trade secrets, citing trade secret statutes and common law claims for conversion and tortious interference.  In the letter, Danaher also stated, "it intend[ed] to enforce Baker's obligations to Danaher against him and anyone acting in concert with him (including Eaton), if such action is necessary."  (Pl.'s PFOFs (dkt. #176) ¶ 13 (quoting Berg Decl., Ex. 7 (dkt. #179-9) 2).)

On September 30, Baker signed a certification that he returned "all copies of all tangible materials [he] received from Danaher, including but not limited to all DBS related materials, printed or electronically stored." (Pl.'s Add'l PFOFs (dkt. #244) ¶ 114 (quoting

Berg Decl., Ex. 8 (dkt. #179-10) 3).)   At the time he signed that certification, Baker testified that he believed it was accurate, but in fact he still had in his possession "Danaher PowerPoint presentations, Danaher templates, all things related to DBS tools basically," which he subsequently deleted.  (*Id.* ¶ 115 (quoting Baker Dep. (dkt. #217) 76, 80-81).)  Baker also testified at this deposition that he deleted these materials because "he did not what [his] current employer [Eaton] to know [he] possessed Danaher materials," and he did not need any of these material "to do [his] job because Eaton had a much more well-established business system and a set of tools."  (Pl.'s Add'l PFOFs (dkt. #244) ¶ 117; Defs.' Resp. to Add'l PFOFs (dkt. #271) ¶ 117 (quoting Baker Dep. (dkt. #217) 81-82).)

On October 7, Danaher sent another letter alleging that Baker:  exported files to USB devices, including contact lists; deleted files; and retained Danaher's confidential information.  In the letter, Danaher requested that Baker provide it with certain physical objects -- specifically, nine external drives, that Danaher found had been used on Baker's Danaher computer during his final weeks of employment.  Danaher also requested that Baker "preserve any and all Danaher proprietary and confidential data," and that he not "destroy or delete any Danaher information on [his] home computer."  (Pl.'s PFOFs (dkt. #176) ¶ 16 (quoting Berg Decl., Ex. 9 (dkt. #179-11) 2).)  On October 25, 2016, Eaton provided Danaher with one of the external drives referenced in its October 7th letter.  In a subsequent letter dated February 2, 2017, Eaton also informed Danaher that Eaton's "IT department was able to confirm that files from the [external drive] were modified and/or deleted by Mr. Baker on October 12, 2016."  (Pl.'s PFOFs (dkt. #176) ¶ 18 (quoting Berg Decl., Ex. 11 (dkt. #179-13) 1).)

Finally, on December 27, Danaher sent a letter to both Eaton and Baker further asserting that he deleted approximately 50,000 files from a USB drive and exported files to a USB drive, including contact lists.  While at Danaher, Baker also kept his Lean Focus "approach" presentation, discussed more below, on a flash drive, in a folder marked personal.  The flash drive contained a number of other Danaher documents.  Baker did not return the flash drive and other Danaher computer files and materials within two days of his departure from Danaher, contrary to its instructions.  Baker does not dispute this, but contends that he did not view the materials on the flash drive as confidential Danaher materials, either because the materials were developed from other third-party materials or were shared outside of the company.

On January 30, 2017, Eaton terminated Baker's employment.  While Baker avers in his declaration at summary judgment that he was terminated because of Danaher's accusations in their various letters to him and Eaton, as plaintiff points out, Baker testified at his deposition that he was terminated for deleting Danaher documents after Eaton told him to retain them.  (Defs.' PFOFs (dkt. #186) ¶ 74 (Baker 5/4/21 Decl. (dkt. #190) ¶ 14; Pl.'s Resp. to Defs.' PFOFs (dkt. #244) ¶ 74 (citing Baker Dep. (dkt. #217) 84).)  In their reply, defendants argue that there is no inconsistency between these two statements. In other words, Baker's statement that he was terminated by Eaton because of Danaher's communications encompasses the more specific explanation that he provided during his deposition.  (Defs.' Reply in Support of Defs.' PFOFs (dkt. #271) ¶ 74.)  Regardless, in a February 2, 2017, letter to Danaher, Eaton explained that it terminated Baker's employment because his "actions were not consistent with [Eaton's] previous instructions

17

to him or his representations to" Eaton.  (Pl.'s PFOFs (dkt. #176) ¶ 21 (quoting Berg.
Decl., Ex. 11 (dkt. #179-13) 1).)

### G. Lean Focus

#### 1. Formation and Overview

After his departure from Eaton, Baker started operating "Lean Focus, LLC, a Lean
consulting company."  Plaintiff disputes the start date of Lean Focus, pointing out that
Baker testified at his deposition that he created Lean Focus, LLC, in 2012, while still an
employee of Danaher.   In addition, Baker also created a Lean Focus "approach"
presentation in 2012, which contained a list of business system tools "based on Danaher
tools."  (Pl.'s Add'l PFOFs (dkt. #244) ¶ 109 (citing Baker Dep. (dkt. #217) 27).)  As
defendants point out, however, Baker also testified that he created the limited liability
corporation, Lean Focus, in 2012, because he was unhappy at Danaher at that time, but
only worked on the concept for a couple of weeks, then dropped it until 2017.

By February 2017, Baker had ideas for the following Lean Focus Business System
tools:  Value Stream Mapping, Problem Solving, Standard Work, Strategy Deployment,
Strategic   Planning,   Executive   Champion   Development,   Transactional   Process
Improvement, 6S & Visual Controls, 8 Wastes, and Daily Management.   In addition,
Baker's spouse, April Lee, who also worked at Danaher at some point, helped him with
formatting of a "client-facing proposal presentation deck."  Lee increased her participation
in Lean Focus in April 2019, becoming its Managing Director, and later a part owner in
April 2020.  In addition, Rene Frauenknecht is now a Director of Lean Focus; Kathryn
Strasburg serves as Lean Focus's Director, Lean Focus Business System; Guy Schiller is its

Senior Vice President, Leadership Practice; Chris Koeppen was also a Lean Focus supply chain and operations practitioner; and Slobodan Djukic was the Director of LBS Lean for Lean Focus.  Finally, in 2020, Lean Focus added a second consultant in Denmark, and in early 2021, Lean Focus added two people in Germany.

### 2.  Continued Communications from Danaher

After starting Lean Focus, Danaher continued to send correspondence to Baker's prior counsel.  In a February 24, 2017, letter, Danaher stated that it wants to conduct a forensic inspection of Baker's personal electronic device "to avoid legal action."  (Pl.'s PFOFs (dkt. #176) ¶ 22 (quoting Berg Decl., Ex. 12 (dkt. #179-14) 3).)  In a March 11, 2017, Baker's counsel responded, requesting the legal and factual bases for such a review. In a May 26, 2017, letter, Danaher advised that it was aware Baker had formed Lean Focus and alleging that:  Baker was violating his contractual obligations to Danaher; Lean Focus was using proprietary DBS material; Baker was targeting Danaher employees in recruiting and hiring to gain more confidential information; Baker was using DBS experience as an advertising tool; through Lean Focus, Baker was "essentially trying to sell DBS to clients"; Baker retained Danaher proprietary information; Baker delete Danaher information; and Baker and Lean Focus were misappropriating Danaher's trade secrets.  In that letter, Danaher also purported to reserve all rights to bring claims against defendants and explained that it "would not hesitate" to protect its rights in litigation.  (Defs.' PFOFs (dkt. #186) ¶ 76 (citing Ex. 166 (dkt. #189-16) 3).)

Baker's counsel responded in June 2017, denying that Baker had any Danaher information and accusing Danaher of "threatening some sort of legal action for the

imagined retention of Danaher information." (Pl.'s PFOFs (dkt. #176) ¶ 25 (quoting Berg Decl., Ex. 15 (dkt. #179-17) 2).) Because Danaher did not reply to his counsel's letter, Baker avers that he understood the matter to be resolved, although at his deposition, he also acknowledged that no one told him that Danaher would not pursue legal action against him. More than two years passed without any word from Danaher before Danaher filed this lawsuit in September 2019, during which Baker built Lean Focus into a successful and profitable business, earning more than $2.2 million in profit over that time. Since Lean Focus started selling services in 2017, its revenues have also increased by more than $1 million every year to approximately $5.8 million in revenue in 2020, and further growth projected in 2021.

During this time, Danaher continued to monitor defendants' activities. While Baker had blocked Sekowski on LinkedIn, Sekowski asked at least one Danaher colleague to alert him to any "interesting posts" on Baker's LinkedIn page. (Defs.' PFOFs (dkt. #186) ¶ 80 (quoting Ex. 172 (dkt. #189-22)).) Consistent with that request, between April 2017 and June 2019, Danaher employees sent Sekowski information about Baker's efforts to market Lean Focus on LinkedIn, Lean Focus workshops, independent contractors of Lean Focus, and Lean Focus clients. Sekowski also monitored Baker's online presence. In October 2017, Sekowski sent an email to another Danaher colleague about identifying someone who is not "findable on LinkedIn," perhaps a "brother or sister in law," to attend a Lean Focus workshop. (*Id.* ¶ 83 (quoting Ex. 177 (dkt. #189-27) 2).) Defendants further aver that they have recently identified a person who attended a January 2018 workshop in San Diego, California, apparently at Danaher's behest.

### 3. Danaher Documents in Lean Focus's Possession

In this litigation, Lean Focus and its independent contractors have produced 35 documents that plaintiff contends were created at Danaher based on metadata, including author and commentator information.  (Berg Decl., App. A (dkt. #179-1) (listing 8 documents created at Danaher based on author metadata); *id.*, App. B (dkt. #179-2) (listing 27 documents originating at Danaher based on commenter metadata).) Defendants argue that the presence of comments by an individual who once worked at Danaher does not establish that a particular document was created *at* Danaher.  Baker further avers that a number of these documents were received from third parties or downloaded from the internet, rather than received directly from Danaher.  In reply, Danaher also points to one document with comments from an employee who has worked for Danaher continuously since 1993 and has never worked for Lean Focus; it also points out that four of these documents contain the comment "[f]or DBS internal tracking purposes only."  (Pl.'s Reply in Support of Pl.'s PFOFs (dkt. #259) ¶ 44.)  The parties similarly dispute whether Lean Focus used all of these documents in connection with its consulting business.  Moreover, Lean Focus Director Schiller admitted during his deposition that he retained materials obtained during his employment with Danaher, and he used those documents for his work at Lean Focus.[10]

---

[10] Since neither party moved on the second element of the trade secret misappropriation claims -- that defendants misappropriated trade secrets -- the court does not recount the proposed findings concerning defendants alleged misappropriation of trade secrets, but rather has focused solely on the documents that plaintiff relies on in pressing its Wisconsin Computer Crimes Act claim.

OPINION

## I.  Plaintiff's Motion for Partial Summary Judgment

### A.  Defendants' Affirmative Defenses

Defendants asserted a number of affirmative defenses in their answer.  In response to plaintiff's motion for partial summary judgment, defendants have withdrawn the following affirmative defenses:  competition privilege, waiver and/or estoppel, economic loss doctrine, failure to mitigate and public policy.  (Defs.' Opp'n (dkt. #228) 13.)  As such, the court will grant plaintiff summary judgment as to those defenses.  Plaintiff also seeks summary judgment in its favor on laches and unclean hands, and as to these two defenses, defendants object to summary judgment in plaintiff's favor.  The court addresses each in turn.

### 1.  Laches

"Laches is an affirmative, equitable defense designed to bar relief when a claimant's failure to promptly bring a claim causes prejudice to the party having to defend against that claim." *Wis. Small Businesses United, Inc. v. Brennan*, 2020 WI 69, ¶ 11, 393 Wis. 2d 308, 946 N.W.2d 101 (citing *Sawyer v. Midelfort*, 227 Wis. 2d 124, 159, 595 N.W.2d 423 (1999)).  The defense "is broadly understood to ask whether a party delayed without good reason in raising a claim, and whether that delay prejudiced the party seeking to defend against that claim." *Id.* (citing *State ex rel. Wren v. Richardson*, 2019 WI 110, ¶ 14, 389 Wis. 2d 516, 936 N.W.2d 587).  To prove this defense, defendants must establish that "(1) [plaintiff] unreasonably delay[ed] in bringing a claim; (2) [defendants] lack[ed] knowledge that [plaintiff] would raise that claim; and (3) [defendants are] prejudiced by

22

the delay." *Id.*, 2020 WI 69, at ¶ 12 (citing *Richardson*, 2019 WI 110, at ¶ 15).  Whether defendants satisfy that burden "is a question of law." *Id.* (citing *Richardson*, 2019 WI 110, at ¶ 16).[11]  Moreover, even if defendants demonstrate all three elements, "application of laches is left to the sound discretion of the court asked to apply this equitable bar." *Id.* (citing *Richardson*, 2019 WI 110, at ¶ 15).

Recently, the United States Supreme Court has held that "laches cannot preclude a claim for damages incurred within" the statute of limitations period for claims sounding in copyright and patent law.  *See Petrella v. Metro–Goldwyn–Mayer, Inc.*, 572 U.S. 663 (2014) (patent); *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954 (2017) (copyright).  In so holding, the Court explained, "[l]aches is a gap-filling doctrine, and where there is a statute of limitations, there is no gap to fill." *SCA Hygiene Prod. Aktiebolag*, 137 S. Ct. at 961.  While this holding has not yet been applied in the trade secret context, plaintiff argues that "Defendants' laches defense fails, as the Seventh Circuit held that, in trade secret cases such as here, the question of laches 'essentially collapses into the statute of limitations analysis.'"  (Pl.'s Opening Br. (dkt. #174) 12.)  However, the case plaintiff points to for support, *Sokol Crystal Products, Inc. v. DSC Communications Corporation*, 15 F.3d 1427 (7th Cir. 1994), does *not* hold that laches is never available in trade secret cases.  Instead, in *Sokol Crystal*, the Seventh Circuit affirmed the district court's

---

[11] Despite this language, there appears to be some support for a jury to decide whether plaintiff's delay in bringing suit was "reasonable." *See Advanta USA, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, No. 04-C-238-S, 2004 WL 7346791, at *10 (W.D. Wis. Oct. 28, 2004) (discussing *Gammon v. Abrams*, 53 Wis. 323, 326, 10 N.W. 479 (1881)); *Corroon & Black-Rutters & Roberts, Inc. v. Hosch*, 109 Wis. 2d 290, 315, 325 N.W.2d 883, 895, n.9 (1982), *superseded by statute on other grounds*, Wis. Stat. § 134.90 (citing *Gammon*).  In their pretrial submissions, therefore, the parties should consider whether any aspect of the laches defense should be presented to the jury.

rejection of a laches defense because it failed for the same reason that the statute of limitations defense also failed.  As the court explained,

> DSC alleges that Sokol, by sitting on its hands even though it allegedly knew that DSC was misappropriating its trade secret, in effect ran up the damages caused by the misuse. But this question essentially collapses into the statute of limitations analysis. Just as with the statute of limitations, the question is when did Sokol know that it had a cause of action?.

15 F.3d at 1430.  Thus, in *Sokol*, the Seventh Circuit did *not* hold that there is no role for laches in the context of a trade secret misappropriation claim.

With the statute of limitations aside as a complete bar, the court turns to the three elements of the laches defense described above.  *First*, defendants must demonstrate that plaintiff unreasonably delayed bringing suit.  Plaintiff contends that defendants cannot prove this element because its two-and-a-half year investigation of Baker's conduct and evaluation of its claims against him was reasonable as a matter of law.  The record reflects that plaintiff investigated its claims against Baker -- and communicated those findings to him -- for the roughly eight-month period following the termination of his employment from September 2016 through May 2017, but there is nothing in the record to reflect any ongoing investigation, other than perhaps sending a surrogate to an isolated Lean Focus workshop in January 2018.  Moreover, as described above, the letters Danaher sent to Baker and his former employer Eaton demonstrate plaintiff had knowledge of the key elements of plaintiff's claims asserted in this case in late 2016 and early 2017.  (Berg Decl., Ex. 7 (dkt. #179-9) (September 23, 2016, letter noting Danaher's discovery "that Mr. Baker has been publicly disclosing Danaher's confidential information and trade secrets via his LinkedIn profile"), Ex. 9 (dkt. #179-11) (October 7, 2016, letter stating that

Danaher had "evidence of mass deletions of data" and "consider[ed Mr. Baker] to currently be in possession of Danaher proprietary and confidential data"), and Ex. 14 (dkt. #179-16) (May 26, 2017, letter stating, the Lean Focus website, and other information learned, "reveal that Mr. Baker is targeting Danaher employees trained on DBS for hire," he is "essentially trying to sell DBS to clients as the hook to gain their business," and he "retained Danaher proprietary information upon his departure which remains unaccounted for").)  Even discounting for the fact that Danaher may have been lulled into inaction by Baker's inaccurate September 30, 2016, certification that he had destroyed any remaining Danaher information in his possession, defendants have raised a genuine issue of material fact as to whether the delay in filing the lawsuit was justified by a need for additional investigation.

In its reply brief, plaintiff also contends that this period was reasonable as an attempt to "resolve a dispute," citing as support the decision in *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813 (7th Cir. 1999).  However, while explaining that "[a]ttempts to resolve a dispute without resorting to a court do not constitute unreasonable delay for determining the applicability of the doctrine of laches," the Seventh Circuit also explained in *Hot Wax* that a "sparse letter writing campaign can hardly be characterized as a serious attempt to resolve its concerns."  *Id.* at 823-24 (internal citation and quotation marks omitted); *see also A.C. Aukerman Co. v. Miller Formless Co.*, 693 F.2d 697, 700 (7th Cir. 1982) ("[T]he negotiations must ordinarily be continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delays."); *Prestwick Grp., Inc. v. Landmark Studio Ltd.*, No. 14-CV-731-JPS, 2015 WL 2384191, at *8 (E.D. Wis. May 19, 2015) ("[T]wo cease

25

and desist letters in this case do not reflect a genuine attempt to settle the infringement dispute.").

Had Danaher's letter campaign extended over the entire period leading up to the filing of the lawsuit, or at least replied to Baker's counsel June 2017 letter claiming no further misuse, that evidence of any further violation would be pursued, plaintiff's arguments would have more traction. However, after that response, plaintiff was silent for more than two years before filing this lawsuit. On this record, therefore, the court is hard-pressed to find that the delay was reasonable in light of genuine, ongoing negotiation efforts. Rather, as the court views the record, whether plaintiff's delay was reasonable turns on the reasonableness of its sitting on a claim to see if Baker would again attempt to use the trade secrets in a way that will make the lawsuit worthwhile to pursue. Although this court notes a similar issue in the trademark context, neither party cites any cases expressly on point, and courts are reluctant to find reasonable delay where a plaintiff apparently waits to file until a defendant's business is a success. *See generally* 6 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 31:14 (5th ed. 2021).[12]

*Second*, plaintiff contends that defendants cannot credibly claim that they lacked knowledge that plaintiff would bring this lawsuit -- the second element of a successful laches defense. However, despite there being no dispute that Danaher threatened legal action in their letters to Baker in late 2016 and early 2017, defendants contend that

---

[12] Plaintiff did cite to *Chesemore v. All. Holdings, Inc.*, No. 09-CV-413-WMC, 2013 WL 2403384, at *2 (W.D. Wis. May 31, 2013), in support of delaying filing of a suit to gather information about whether the expense and burden is worth it. However, *Chesemore* involved a complex set of commercial transactions that took years to unfold, wholly unlike an alleged, one-time purloining of trade secrets by an employee on the way out the door as in this case.

"[w]hen Danaher did not respond to the June 2017 letter from defendants' counsel], Mr. Baker and Lean Focus understood the matter to be resolved, an understanding that was confirmed when more than two years passed without Danaher sending any further correspondence or initiating any legal action against Mr. Baker or Lean Focus." (Defs.' Opp'n (dkt. #228) 7 (internal citation and quotation marks omitted).) The court agrees with defendants that plaintiff's silence *could* be interpreted as lulling defendants into believing that they were "in the clear," and plaintiff had opted not to pursue legal action, or at least a reasonable fact finder could so conclude. At minimum, plaintiff has not directed the court to any cases foreclosing application of this defense similar to the present fact pattern, where an early communication repeatedly threatening legal action was then followed by years of silence.

*Third*, plaintiff seeks summary judgment on defendants' laches defense given defendants' failure to meet the last element of demonstrating prejudice. As to this defense, "Courts commonly describe two types of prejudice: evidentiary and economic." *Richardson*, 2019 WI 110, at ¶ 33. Evidentiary prejudice "may arise where a plaintiff's delay in bringing an action has curtailed the defendant's ability to present a full and fair defense on the merits due to the loss of evidence, the death of a witness, or the unreliability of memories," and economic prejudice occurs when "the costs to the defendant have significantly increased due to the delay." *Id.* ¶ 33 & n.26. In response to plaintiff's motion, defendants contend that they suffered both types of prejudice. With respect to the former prejudice, defendants criticize plaintiff's failure to issue a litigation hold, but this seems tangential to any delay in bringing this lawsuit. Defendants' alleged economic prejudice, however, has

27

more traction, at least enough to survive plaintiff's motion for summary judgment. Specifically, Baker avers that had Danaher filed its lawsuit earlier when Lean Focus was in its early stages of development, "Defendants likely would have had no choice but to decide to dissolve the business given the potential cost of litigation against Danaher."  (Defs.' Opp'n (dkt. #228) 9.)  However, relying on a belief that plaintiff would not sue them, defendants claim they instead "continued to build their business to significant profitability—profits which Danaher now seeks to recover."  (*Id.*)

For these reasons, the court concludes that there are fact issues that preclude granting summary judgment to either party on defendants' laches defense, although the balance of the evidence favors plaintiff.  These determinations, even if required to be made by the court, rather than a jury, are better made during the course of trial on a more robust record.

### 2.  Unclean Hands

Plaintiff also seeks summary judgment on defendants' unclean hands defense, premised on defendants' accusation that plaintiff used third parties' stolen, proprietary material to develop DBS.  This defense implicates the same issue discussed below as part of defendants' motion for summary judgment, namely, whether the DBS is entitled to trade secret protection.  For the same reasons that the court will deny defendants' motion for summary judgment on plaintiff's trade secret claims, the court also will deny plaintiff's motion on this unclean hands defense.  Ultimately, this defense is tied up in whether DBS

(or portions of DBS) is entitled to trade secret protection.[13]

## B. Wisconsin Computer Crimes Act Claim

Finally, plaintiff also seeks summary judgment in its favor on its claim defendant Lean Focus under the Wisconsin Computer Crimes Act ("WCCA") Wis. Stat. § 943.70(2)(a). As a party moving for summary judgment on a claim for which it bears the burden of proof, plaintiff "must lay out the elements of the claim, cite the facts [that] it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

The WCCA prohibits "willfully, knowingly and without authorization" accessing, taking possession of, or copying "computer programs or supporting documentation." *See Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, No. 14-CV-748-WMC, 2016 WL 845341, at *23 (W.D. Wis. Mar. 2, 2016). Because Wisconsin's adoption of the Uniform Trade Secrets Act "displaces conflicting tort law, restitutionary law and other law of [Wisconsin] providing a civil remedy for misappropriation of a trade secret," Wis. Stat. § 134.90(6)(a), this claim only covers non-trade secrets. *See Burbank Grease Servs., LLC v. Sokolowski*, 2006

---

[13] Plaintiff submitted facts and also sought summary judgment in its favor on an unclean hands defense based on Danaher's alleged interference with defendants' business by discouraging individuals from becoming consultants with Lean Focus. Since defendants have withdrawn this defense in response to plaintiff's motion for summary judgment (Defs.' Opp'n (dkt. #228) 10 n.6), the court need not set out those facts or otherwise consider that theory. Instead, this discussion is limited to defendants' position that plaintiff acted with unclean hands in developing DBS by using third parties' stolen, proprietary material.

WI 103, ¶ 33, 294 Wis. 2d 274, 717 N.W.2d 781 ("[A]ny civil tort claim not grounded in a trade secret, as defined in the statute, remains available." (emphasis removed)).

In response to plaintiff's motion, defendant Lean Focus contends that summary judgment is not warranted for three reasons:  (1) plaintiff has failed to demonstrate that these documents belonged to Danaher; (2) plaintiff has failed to demonstrate that defendant "knowingly" and "willfully" took possession of these documents; and (3) plaintiff has failed to demonstrate that Lean Focus (as opposed to its so-called, independent contractors) took possession of these documents.  As detailed above in the facts, plaintiff directs the court to 35 documents it contends were produced by defendants or by Lean Focus's contractors in the course of discovery that were originally created by Danaher.  In response, defendant challenges plaintiff's claim that these were Danaher-created documents based on evidence that:  (1) 22 documents were "received by a Lean Focus contractor via email from a Lean Focus client"; (2) two documents were "derived from templates that Mr. Baker found on non-Danaher websites in Google searches and downloaded from the internet, [each of which] already contained Danaher metadata when they were downloaded"; and (3) another eight documents were from independent contractor productions "without any evidence that Lean Focus itself intentionally or knowingly possessed or copied those documents."  (Defs.' Opp'n (dkt. #228) 15-18.) With respect to the remaining, three documents -- a DBS immersion template, a sales manager guide and a president's letter template -- defendant Lean Focus concedes that these Danaher documents are in their possession, but contends it "did not gain possession of the documents intentionally or with a 'purpose to do wrong.'"  (*Id.* at 20.)

As set forth above, Lean Focus has sufficiently challenged plaintiff's proof as to certain of the documents, but there appears to be no dispute that at least eleven of those documents belonged to Danaher -- the eight documents obtained through its independent contractors and not by Lean Focus itself, along with the three documents it claims were not possessed willfully.  As for the claim that these eleven documents were not "knowingly" or "willfully" taken, defendant directs the court to Black's Law Dictionary's definition of "willful" as "[v]oluntary and intentional," involving "conscious wrong or even purpose on the part of the actor."  (Defs.' Opp'n (dkt. #228) 14 (quoting *Willful*, BLACK'S LAW DICTIONARY (11th ed. 2019)).)  Defendant also points to a 1909 Wisconsin Supreme Court case explaining that "[t]he word 'willfully' has acquired a pretty well defined meaning . . . when used to describe acts which should be punished criminally, it includes, in addition to mere purpose to do the act, a purpose to do wrong."  (*Id.* (quoting *Brown v. State*, 119 N.W. 338, 350 (Wis. 1909)).)  In more recent cases, however, plaintiff argues that the Wisconsin Supreme Court has "departed from the notion that 'willful' imposes such a 'heightened intent requirement."  (Pl.'s Reply (dkt. #258) 19 (quoting *State v. Hanson*, 808 N.W.2d 390, 397 (Wis. 2012)).)  Instead, this more recent caselaw holds all that is required is intentionality, which means "with 'purpose to do the thing or cause the result specified' by the statute."  (*Id.* (quoting *State v. Cissell*, 378 N.W.2d 691, 694 (1985)).)  Thus, the court agrees with plaintiff that it is enough to show defendant Lean Focus intended to possess Danaher documents, without needing to show that it intended to violate the WCCA or otherwise intended to do wrong.

31

Defendant also challenges whether it possessed these document "knowingly," again pointing to Black's Law Dictionary for support, defining "knowing" as "[h]aving or showing awareness or understanding," "deliberate," or "conscious." (Defs.' Opp'n (dkt. #228) 14 (quoting *Knowing*, BLACK'S LAW DICTIONARY (11th ed. 2019)).) As defendant points out in its brief, at least with respect to some of the remaining eleven documents, Lean Focus' independent contractors received them via email from clients. Moreover, Lean Focus (including its contractors) raise a viable, disputed issue of facts as to its "awareness" or "conscious" possession of these documents. Thus, the record is not so clear-cut to foreclose a finding in defendant's favor on this aspect of the claim, at least with respect to some of the documents.

Finally, defendant contends, again with respect to certain of the documents, that plaintiff has only demonstrated independent contractors, rather than Lean Focus itself, possessed Danaher-created documents. However, this argument fails to get off the ground in light of undisputed evidence that Lean Focus gives these contractors titles, *and* more importantly, it authorizes these contractors to present themselves to clients as Lean Focus agents. (Pl.'s Reply (dkt. #258) 20 (citing *Lang v. Lions Club of Cudahy Wis., Inc.*, 939 N.W.2d 582, 591 (Wis. 2020) (finding contractors are agents)).)

At minimum, however, plaintiff has demonstrated that defendant violated the act with respect to three documents that came directly from Danaher into Lean Focus's possession: a DBS immersion template, a sales manager guide and a president's letter template. As for the other documents, defendant has at least raised an issue of fact as to whether those documents were Danaher-created or knowingly possessed. Consistent with

32

the above, therefore, plaintiff's motion is granted in part and denied in part with respect to the WCCA claim.[14]

## II. Defendants' Motion for Summary Judgment

### A. Trade Secret Claims

Plaintiff claims defendants misappropriated its trade secrets in violation of Wisconsin's Uniform Trade Secrets Act ("UTSA"), Wis. Stat. § 134.90, and the federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836. "[C]ourts may look to the state UTSA when interpreting the DTSA." *Kuryakyn Holdings, LLC v. Ciro, LLC*, 242 F. Supp. 3d 789, 797 (W.D. Wis. 2017). The UTSA bars disclosing or using without consent a trade secret acquired through improper means. As such, plaintiff must prove the same two elements as to each act: (1) the information at issue is a trade secret; and (2) the defendant misappropriated it. *Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d 997, 1025 (E.D. Wis. 2010).

The UTSA defines a trade secret as

> information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
>
> 1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> 2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

---

[14] Of course, any remedy for this violation will await trial.

Wis. Stat. § 134.90(1)(c); *see also* 18 U.S.C. § 1839(3) (defining trade secret under DTSA).

Of course, plaintiff bears the burden of demonstrating that "the information at issue [is]

actually a trade secret[.]" *Kuryakyn Holdings*, 242 F. Supp. 3d at 798.

In determining what constitutes a trade secret under the UTSA, courts may

consider:

> (1) the extent to which the information is known outside the business, (2) the extent to which it is known by employees and others involved in the business, (3) the extent of measures taken to guard the secrecy of the information, (4) the value of the information to the business and its competitors, (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Genzyme Corp. v. Bishop*, 463 F. Supp. 2d 946, 949 (W.D. Wis. 2006) (citing *Minuteman,*

*Inc. v. L.D. Alexander*, 147 Wis.2d 842, 852, 434 N.W.2d 773, 777 (1989)).[15]

As described above, defendants move on the first element of plaintiff's claims,

seeking summary judgment in their favor on the basis that defendants cannot demonstrate

DBS is entitled to trade secret protection.[16]  In its opposition brief, plaintiff contends that

"[t]he key predicate question to Defendants' motion is what is the trade secret."  (Pl.'s

Opp'n (dkt. #243) 19.)  That is a fair question, although it is *plaintiff's* burden to define

the trade secrets.  Indeed, in *Kuryakyn Holdings, LLC v. Ciro, LLC*, 242 F. Supp. 3d 789

---

[15] Defendants concede that certain of these factors are satisfied or lean in favor of finding trade secret protection.  In particular, three is not dispute that Danaher spends millions of dollars annually on DBS, and that deploying DBS has helped Danaher improve its operating companies' performance across a variety of metrics and contributed to Danaher's overall success.

[16] In moving against this element on summary judgment purposes, defendants emphasize they are not conceding the second element (misappropriation of the trade secrets) for purposes of trial.

(W.D. Wis. 2017), this court granted summary judgment to the defendant on similar claims because the plaintiff failed to adequately "identify specific documents or information that constitute trade secrets." *Id.* at 800 (citing *Marine Travelift, Inc. v. Marine Lift Sys., Inc.*, No. 10-cv-1046, 2013 WL 6255689, at *6 (E.D. Wis. Dec. 4, 2013)).

In contending that the claimed "trade secret" is already known outside Danaher, defendants rely on the expert report of plaintiff's DBS Trade Secrets Custodian Thomas Sekowski. In his report, Sekowski compares the structure of DBS to Lean Focus's Business System. (Sekowski Rept. (dkt. #156) ¶ 12.) Sekowski then walks through a number of slides, illustrating similarities between DBS slides and that of Lean Focus's with various arrows. In turn, defendants reasonably use the DBS slides highlighted in this report as a roadmap to show that these materials were either publicly available and/or created by using third-party materials, and accordingly, not entitled to trade secret protection.

In response, plaintiff reasserts that its trade secrets cannot be defined by isolated slides, but instead "are the unique combination of tools that comprise DBS and the unique sequence of concepts embodied in these DBS tools." (Pl.'s Opp'n (dkt. #243) 19.) Viewed in this light, plaintiff takes issue with defendants' and their experts' "slide-by-slide attempt to demonstrate the public availability of discrete bits and pieces of individual DBS tools," arguing that this approach "invites legal error." (*Id.*) Instead, plaintiff argues under *3M v. Pribyl*, 259 F.3d 587 (7th Cir. 2001), that "every component of a trade secret can be publicly available if the trade secret then assembles these publicly available parts into a unique whole that is not publicly available." (*Id.* (citing *3M*, 259 F.3d at 595-96).) "Even under *3M*," however, "plaintiffs must still point to something about their [asserted trade

secrets], in whole or in part, that make them different from [information] that [is] publicly available. Plaintiffs cannot escape their burden of proof with a conclusory statement that 'everything' is a trade secret." *DF Inst., LLC v. Dalton Educ., LLC*, No. 19-CV-452-JDP, 2020 WL 4597122, at *5 (W.D. Wis. Aug. 11, 2020) (internal citation omitted).  Said another way, plaintiff cannot rely on its expert's comparisons between DBS slides and Lean Focus slides in an attempt to show misappropriation, but then disavow that the slides themselves represent trade secrets to avoid a finding that each slide is publicly available or derived from other sources, except to argue that the unique assembly of DBS "as a whole" is not publicly available under *3M*.

Regardless, taking the DBS materials noted in Sekowski's report as a whole to be the claimed trade secret, defendants still offer two core arguments in support of their motion: (1) Danaher has not made reasonable efforts to maintain the secrecy of DBS; and (2) DBS is generally known and readily ascertainable.  As this court has previously explained, "because determining what constitutes a trade secret requires an evaluation of numerous factors, the existence of a trade secret is ordinarily a question of fact that is inappropriate for summary judgment." *Weather Shield Mfg., Inc. v. Drost*, No. 17-CV-294-JDP, 2018 WL 3824150, at *1 (W.D. Wis. Aug. 10, 2018) (citing *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003); *N. Highland Inc. v. Jefferson Mach. & Tool Inc.*, 2017 WI 75, ¶ 67, 377 Wis. 2d 496, 898 N.W.2d 741).

*First*, with respect to whether the plaintiff has taken reasonable measures to maintain the secrecy of the trade secret, the court has indicated that this issue is only amenable for resolution at summary judgment in "extreme cases," *Weather Shield*, 2018

WL 3824150, at *3.  Defendants argue that this is such an extreme case, pointing to the following evidence in support:

- Every employee with a username and password for Danaher's intranet, may access DBS materials, including the DBS tools Danaher contends defendants misappropriated.

- Danaher's internal policy and training materials do not label DBS as trade secrets.

- Not every Danaher employee with access to DBS materials is required to sign a nondisclosure agreement.

- Danaher shares its materials with third parties, including nonprofits and strategic partners, who until recently were not required to sign nondisclosure agreements.

- Danaher has made DBS materials accessible online without login credentials.

(Defs.' Opening Br. (dkt. #185) 26-27.)

In response, plaintiff again maintains that publicly disclosed, "high-level information" is "insufficient to replicate DBS or DBS tools."  (Pl.'s Opp'n (dkt. #243) 36.) Plaintiff also maintains that any "unauthorized disclosure" does not mean that DBS is "generally known or readily available."  (*Id.* at 37.)  Plaintiff further points to its Code of Conduct (or its prior Standards of Conduct), which requires its employees not to reveal "confidential Danaher information" outside of the company; its annual training modules that cover confidentiality requirements, including DBS, even if not expressly; a password-protected intranet site; the required signing of nondisclosure agreements, at least with respect to some employees and third parties accessing DBS; and its monitoring of any public disclosure of its trade secrets by instructing employees to remove Danaher materials from public sites and its sending of cease-and-desist notices to other, unauthorized

37

publishers of its trade secrets.  (Pl.'s Opp'n (dkt. #243) 46-64.)  Although Danaher has failed to meet its burden to show specific *parts* of its eight tools comprising DBS are subject to trade secret protection, this evidence is sufficient to raise a genuine issue of material fact as to whether Danaher took reasonable steps to maintain the secrecy of DBS's nine tools or modules or some combination of those tools, including DBS as a whole.[17]

*Second*, defendants contend that DBS is generally known, given that it was derived from other Lean materials, beginning with the Toyota Production System, similar systems that followed, and source material from third parties used in its development, including consultants and its employees' former employers.  In support, defendants also rely on its expert Russ Scaffede's review of DBS materials, and his conclusion that they are "industry standard, based on or derived from publicly available materials, and/or have been disclosed to the public."  (Defs.' PFOFs (dkt. #186) ¶ 90 (citing Scaffede 5/4/21 Decl. (dkt. #191) ¶ 2).)  Scaffede further opines that there is nothing about the arrangement, sequencing or compilation of Danaher's claimed trade secret materials that affords it any kind of competitive advantage or provides value to Danaher from not being publicly known.  (*Id.* ¶ 91 (citing Scaffede 5/4/21 Decl. (dkt. #191) ¶ 3).)  Defendants' other expert provides similar analysis in his report.

---

[17] Plaintiff has offered sufficient evidence that each of following seven tools or modules of DBS were developed by Danaher and remain under constant improvement which *may* be subject to trade secret protection individually or in combination:   Problem Solving Process; Visual & Daily Management; Policy Deployment; Lean Conversion; Reliability Systems, including CDT&R; and Quality System Basics; Transaction Process Improvement; Funnel Management.  (Sekowski Rept. (dkt. #156) Part B; Spear Rept. (dkt. #155) Part VII.)  While plaintiff seems to use other terms for some of these tools, and its experts refer to DBS Immersion and Inventory Management at Gemba, respectively, neither of which plaintiff mentions in briefing, plaintiff may proceed to trial with respect to these seven tools.

"At most," plaintiff argues in response that "defendants show that the general idea of having a business system is generally known, but Danaher does not claim the idea of having a business system is a trade secret." (Pl.'s Opp'n (dkt. #243) 29.) Instead, plaintiff contends that the DBS "sequences," describing nine of them specifically, are not generally known, nor is their combination derived from other sources. (Pl.'s Opp'n (dkt. #243) 33-34.) Here, too, plaintiff has raised a genuine issue of material fact as to whether this trade secret -- again either the nine tools or some combination of those tools, including DBS as a whole -- is generally known and readily ascertainable. Thus, it will be up to the jury to determine whether DBS, including these nine tools or combination of tools, reflects Danaher's own creation rather than industry Lean materials that are generally known separately *and* in combination.

Accordingly, the court will deny defendants' motion for summary judgment on plaintiff's trade secret misappropriation claims. In denying this motion, however, the court also emphasizes that plaintiff is *not* allowed to pursue a claim based on defendants having discrete slides or even slide decks that do not comprise the bulk of one of these nine discrete tools. Instead, plaintiff must prove (1) that each of Danaher's nine tools or modules, some combination of those modules, or DBS as a whole, is entitled to trade secret protection; and (2) defendants misappropriated *those* trade secrets, rather than isolated slides or slide decks.

## B. Breach of Contract Claims

Defendants also seek summary judgment on plaintiff's two breach of contract claims asserted against defendant Baker individually, or at least aspects of those claims. Plaintiff

alleges in Count I of the complaint that Baker violated the 2012 Proprietary Interest Agreement, and in Count II that Baker violated the 2014 Nondisclosure and Assignment Agreement.  Defendant posits two core arguments in support of its motion:  (1) in light of the court's prior decision finding the nondisclosure provision of the 2014 Agreement unenforceable and the merger clause in that Agreement, there is no valid nondisclosure provision that could form a basis for plaintiff's breach of contract claim; and (2) plaintiff did not plead a breach of contract claim based on the assignment-of-invention provisions in both agreements.[18]  *First*, defendant Baker argues that the merger provision in the 2014 Agreement forecloses any breach of contract claim premised on a nondisclosure agreement. As context, the court previously determined that the nondisclosure provision in the 2014 Agreement was unenforceable.  (7/24/20 Op. & Order (dkt. #65) 16.)  As such, that decision leaves only the nondisclosure provision in the *2012* Agreement ostensibly available.  However, Baker contends that the 2012 Agreement's nondisclosure provision does not survive the 2014 Agreement, in light of the following merger clause:

---

[18] Defendant also argues that summary judgment is warranted on the breach of contract claims because the alleged disclosed information is generally known to the public, but this argument hinges on the same argument defendants assert in response to plaintiff's trade secret claims.  Recognizing that "confidential information" could extend beyond Danaher's trade secrets, there are fact issues that preclude summary judgment on this basis for the reasons explained above.  Defendants also contend that injunctive relief is not available because the nondisclosure provision of the 2012 Agreement has expired, but as plaintiff points out, tolling of restrictive covenants during the period of a defendant's non-compliance may be appropriate.  *E.g.*, *JAK Prods., Inc. v. Wiza*, 986 F.2d 1080, 1090 (7th Cir. 1993) (explaining that to not allow tolling of the noncompete during the period of noncompliance would unreasonably reduce the length of the restriction from twelve months to eight months).  Finally, as for defendant's argument that plaintiff does not have any damages that are *unique* to its breach of contract claim, this, too, does not warrant summary judgment in defendants' favor.  Practically speaking, if plaintiff wins on its breach of contract claim, but loses on the trade secret misappropriation claim, then plaintiff could still pursue its damages theory with respect to the breach of contract claim, even though the same (or similar) theory would have been presented if it had been successful on its trade secret misappropriation claims.

> Except as set forth in the Danaher Corporation Standards of
> Conduct, with respect to the subject matters in this Agreement,
> this Agreement is my entire agreement with the Company, and
> its amends (to the extent enforceable) all previous oral or
> written understandings or Agreements made with the
> Company.

(Ex. 164 (dkt. #189-14) 1).)

At first glance, this appears to be a winning argument, except that, in response,

plaintiff directs the court to a section of the Restatement (Second) of Contracts § 279

comment b, which concerns the validity of a substituted contract.   In pertinent part,

comment b states:

> to the extent that the substituted contract is vulnerable on such
> grounds   as   mistake,   misrepresentation,   duress   or
> unconscionability, recourse may be had on the original duty.
> Thus, if the substituted contract is voidable, it discharges the
> original duty until avoidance, but on avoidance of the
> substituted contract the original duty is again unenforceable.

The few courts that have considered this section of the restatement have similarly held that

the original contract remains enforceable if the substituted contract is invalid.  *See, e.g.*,

*GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 329 (S.D.N.Y. 2009)

(under the Restatement; "where the substituted contract is invalid, for indefiniteness or

otherwise, the original contract remains enforceable").   Other than to offer some odd

contract interpretation argument that has nothing to do with the key question raised by

plaintiff, Baker offer no response to this clear guidance in the restatement and caselaw

interpreting it.  As such, the court rejects this basis for summary judgment.

*Second*, defendant Baker seeks summary judgment on plaintiff's breach of contract

claim premised on the assignment of "developments" provisions in both the 2012 and

2014 Agreements.  While asserting that this theory also fails on the merits, Baker contends plaintiff did not plead this claim; instead, it only disclosed this theory for the first time in response to interrogatories served one week before the summary judgment deadline. (Defs.' Reply (dkt. #266) 22.)   Certainly, plaintiff did not need to plead specific legal theories, so long as it had pleaded factual basis for those theories.  *See Whitaker v. Milwaukee Cnty., Wis.*, 772 F.3d 802, 808 (7th Cir. 2014).  However, plaintiff neither mentioned the assignment of developments provisions in either the 2012 or 2014 Agreement in the complaint, nor otherwise alleged that defendant Baker breached those provisions.[19]   As such, the court agrees with defendant that plaintiff failed to give notice of the facts underlying this theory of recovery, and therefore, it is untimely.  *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." (internal citation and quotation marks omitted)).   Thus, the court will grant defendants' motion for summary judgment as to that specific theory.  In all other respects, however, the motion is denied.

### C.  Other Claims[20]

Defendants seek summary judgment on plaintiffs' conversion claim on the basis

---

[19] Nor is the court convinced by any argument that plaintiff recently discovered facts underlying this claim in light of the undisputed evidence that Baker turned over to Danaher a flash drive in October 2016 containing the Lean Focus "approach" slide deck created during the course of his employment with Danaher.

[20] Defendants lob a few, additional cursory challenges to plaintiff's damages theory with respect to other claims, but as explained above with respect to plaintiff's breach of contracts claim, this argument does not warrant entry of summary judgment in defendants' favor.

that it is limited to "tangible property" and "doesn't extend to electronic documents like those at issue in this case." *Weather Shield*, 2018 WL 3824150, at *5; *Epic Sys.*, 2016 WL 4033276, at *27-28.   In response, plaintiff directs the court to *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 557 N.W.2d 67 (1996), asserting under Wisconsin law that a conversion claim can apply to intangible property. While *Management Computer Services* involved software, however, the converted property included *physical* back-up tapes and a *printed* copy of the software, thus undermining plaintiff's attempt to extend a Wisconsin conversion claim to the intangible documents at issue in this case.   As such, the court agrees with defendants that summary judgment on plaintiff's conversion claim is also warranted.

Finally, defendants argues that summary judgment is warranted as to plaintiff's civil theft claim because the mere copying of electronic documents does not deprive plaintiff of such property.   (Defs.' Opening Br. (dkt. #266) 35.)   However, this court previously concluded that "the definition of 'property' [under Wis. Stat. § 943.20] like the definition of 'moveable property' contemplates the inclusion of documents that embody other intangible rights."  *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, No. 14-CV-748-WMC, 2016 WL 1317704, at *4 (W.D. Wis. Apr. 1, 2016).   The court sees no reason to depart from this decision.[21]   Accordingly, defendants' motion as to plaintiff's civil theft claim will be denied as well.

---

[21] Defendants attempt to limit the holding in *Epic* by arguing that it does "not address the intent element of civil theft at all."   (Defs.' Reply (dkt. #266) 35.)   Fair enough, but neither is a determination of Baker's intent amenable to resolution on summary judgment.

ORDER

IT IS ORDERED that:

1) Plaintiff Danaher Corporation's motion for partial summary judgment (dkt. #174) is GRANTED IN PART AND DENIED IN PART.  The motion is granted as to its Wisconsin Computer Crimes Act Claim as to certain documents; in all other respects, the motion is denied.

2) Defendants Damon Baker and Lean Focus LLC's motion for summary judgment (dkt. #184) is GRANTED IN PART AND DENIED IN PART.  The motion is granted as to plaintiff's breach of contract claim as to the assignment of developments provision and plaintiff's conversion claim.  The motion is also granted as to any trade secret misappropriation claim that is not limited to the seven tools articulated above, some combination of those tools or DBS as a whole.  In all other respects, the motion is denied.


Entered this 28th day of July, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge